Good morning. Our first case today is Mator v. Wesco Distribution, Inc. Mr. Schwartz. Thank you, Judge Pardman. Please support. My name is Steve Schwartz. I represent the Mators and I'd like to reserve five minutes for rebuttal if that's okay with the court. Thank you. So we believe the district court's decision dismissing the complaint should be a share class claim, though the decision directly conflicts with this court's decision in Sweden, the Supreme Court's decisions in Tybalt and Northwestern, Judge Brennan's remand decision in Northwestern, and other cases from the Second Circuit, Sixth Circuit, and Ninth Circuit. And there's no difference between our share class claim and any of those other cases. In fact, our complaint literally mirrored the complaint in Sweden. Second, the record-keeping claim dismissal has to be reversed because that also conflicts with the Supreme Court's Northwestern case, this court's decision in Sweden, the Eighth Circuit's decision, and the Washington University case. And our complaint is much stronger than the complaint that was put before this court in Sweden. So we believe the record-keeping claim also should be dismissed. And more fundamentally, the district court needs to be dismissed because it applied the wrong standard at the pleading stage. It said that... Excuse me? You said you think the claim should be dismissed. Oh, no. The reversal of the claim should be... The dismissal of the claim should be reversed. Thank you, Judge Fischer. Can I start at the end with the standard? I mean, it seemed to be a bit of... There was that reference that suggested the improper standard. Throughout, the court seemed to understand that it's a plausibility standard. What am I missing there? Okay. So the court did cite the correct standards in the initial sections of the legal standards section. But in each of the three decisions, the district court summed up and concluded by saying, that said, you have to pass the threshold from mere possibility to probability. Well, under the Apple devices case, which we cited from the Ninth Circuit, that would be enough, even if the court just made a nomenclature mistake, to reverse. The district court, in its analysis, actually showed that it applied the wrong standard. Just as an example, for the record-keeping claim, the district court theorized that, well, maybe when they switched from Wells Fargo, which charged $150 per participant, to Fidelity, which charged $53 per participant, maybe Fidelity was providing some magical extra services. Maybe they had eight telephone operators instead of two. Well, that's not in our complaint. That's not in the proceedings. And that kind of speculation in favor of the defendants is not proper on a motion to dismiss. Similarly, with record-keeping, we had these 16 comparator plans, which showed that the fees, again, were in that $35 to $42 range. The district court said, well, we don't know if those plans provided the same services, even though the box check in the Form 5500, which delineated which services the record-keepers in those comparator plans did, even though those check boxes were the same as the check boxes for Wells Fargo, because maybe the check boxes are wrong. That kind of speculation in favor of a defendant on a motion to dismiss, to me, reflects an application of the wrong standard. We should get all the inferences on a motion to dismiss. Isn't there some inherent tension, though, between what we've historically understood Rule 12 to require and what the Supreme Court said in Hughes? And what I'm focused on is the Hughes statement that court must give due regard to the range of services. Is there some tension there between that injunction in Hughes and what we've traditionally done at the Rule 12, or what district courts have done at the Rule 12 stage? Not at the motion to dismiss stage. Again, depending on what the facts are in the complaint. So on remand, Judge Brennan in Northwestern for the Seventh Circuit sustained both the record-keeping and the share class claims, even though we have far more detail regarding empowerment plans and whatnot supporting those claims. But here's, I think, where the principle that you just said about the flexibility for trustees really comes into place. The trustees have to make reasonable choices that are fair. And if the trustees are fully informed and fulfill their fiduciary duties, they understand the facts, do the math, if there's some math that has to be tomato sauce at Walmart versus buying it from Whole Foods, the trustees do get discretion to make choices that are reasonable. But here, what the trustees did was they did no competitive bidding for 10 years, so they had no clue that when they're paying $154 per participant for record-keeping, that the market rate was 42, as we said, or as they ultimately found out when they actually did competitive bidding and fidelity came in, that it was $53. Paying $154 instead of $53 is not a reasonable choice. And the only inference from the record in the allegations of the complaint is that because they didn't do competitive bidding, they had no idea they were paying far above market. How's a judge supposed to know what the correct frequency is to do such competitive bids was a factor that could be considered. What I would say on the pleading stage, 10 years, that's not reasonable under any circumstance. At the expert summary judgment stage, trial stage, then you'll probably get some expert analysis as to what makes sense for whether it's every two years, every four years. But not doing it for 10 years when the market for the services that you're paying for is one-third of what you're actually paying. On the pleadings, that can't be. We allowed to look back 10 years. Your complaint is time-borrowed and generally you're only asking for damages for the period 2015 to 2021. Can we go back 10 years? Not for damages, but we can look back to evaluate the accredence of the trustees. So for example, if 2015 is within the statute of limitations, if I am deposing a trustee and say, why didn't you do competitive bidding in 2015? In a hypothetical situation, a trustee may say, well, we did it in 2014 or 2013, so I kind of knew what the market was. It wasn't time to do it yet. But in this case, the trustee says, well, I didn't do it in 2015 or 2014 or even back in 2010. I haven't done it for five or six years. My next question at deposition would be, how do you know the market? What does your complaint say as to when they last did this and retained Wells Fargo on the terms that you're complaining about? 10 years. At least 10 years. We don't know that they did it back in 2009. We just know that they didn't, according to our complaint, bid it for the 10 years between the time they hired Wells Fargo and the time they eventually woke up and did a bidding. And the bidding was between Wells Fargo and Vanguard and Transamerica and Voya. So they didn't go put out the bidding to some low-rent record-keeping companies, and it's not $53 because they got some bargain-basement low-quality provider for record-keeping. They competitively bidded out to all the top record-keepers. And Wells Fargo is a top one, too. That's a name everyone knows. And there's no reason for the district court to have speculated that maybe Fidelity is providing fewer services than Wells Fargo provides, and therefore that's the difference in price, particularly since we put in our complaint allegations that the services that were provided did not change, that the price for record-keeping does not materially change for plans that have over 5,000 participants based on differences of services. I think one of the more fundamental flaws of the district court's analysis is we don't have to, we didn't have to speculate what Wells Fargo provided versus what Fidelity provided. My friends put into the record portions of the Wells Fargo and Fidelity agreements, but they strategically left out the portions of those agreements that would reflect the exact services that were contracted for. And to me, that's dumb because it would have helped them. They would have put it in. And to me, it's wrong for the district court to speculate that maybe Wells Fargo is providing greater services that would justify a three times multiple in price. And we did object to the inclusion in the record of portions, selected portions of documents. So we think that the district court, you know, abuses discretion in considering that and speculating, giving the inferences to the defendant. Are you asking for a per se rule that 10 years without competitive bidding is unreasonable? No, I'm not asking for a per se rule for any of our claims here. I'm not saying that you can never ever, for example, there could conceivably in the theoretical world be a reason to have retail shares over institutional shares, even though I don't think in the real world that that ever works. All we're saying is that the pleading stage, if you don't- Well, there are other cases that where lawyers in your shoes have argued the exact opposite. Well, what I would say about that is that the lawyers in my shoes or the Schlifter firm shoes, the lawyers who are the lawyers candidly with the gravitas in our field, all our complaints go one way. That complaint, frankly, is by lawyers none of us know. It was a single complaint in the Seventh Circuit. And even the court in the Albert case said, this is a weird claim. It's the inverse of what everyone argues about this. But to get back to the question, we're not saying that you have to give us summary judgment based on our complaint or judgment on the pleadings. All we're saying is, if you don't bid for 10 years and you're paying three times the market price, that raises at least a plausible inference that they were asleep at the switch, didn't fulfill their fiduciary duties. Yeah, but doesn't Hughes require more? We need to know that it's an apples to apples comparison. Clearly, you've got that three-time multiple, which says something. Three times more expensive says something. But doesn't your burden include a requirement that you plead that for the three times costs, you're getting the exact same or almost the exact same service to make sure that it's an apples to apples comparison? So that kind of detail is not provided either in the Sweda complaint or the Northwestern complaint, but- Well, Hughes, when Hughes decided- Well, Hughes decided after Sweda, but before Northwestern's remand, even though Hughes literally said that Sweda got it, that Your Honor, Judge Fischer got it right in Sweda. You don't think Hughes did anything to alter Sweda? I don't think it did, but I'll say this. It doesn't matter because we provided the detail why the Wells Fargo services were no greater and did not impact price compared to Fidelity. And what we did is, unlike Sweda, unlike Northwestern, we had 16 comparator plans, some a little bit bigger, some a little bit smaller than WESCO. The WESCO plan was right in the sweet spot in the middle. And what that showed was the market for the record-keeping was about $42 per participant. We also show that the checkboxes in the Form 5500s for those 16 checkboxes as the checkbox that Fidelity and Wells Fargo did. And in addition- Let me stop you there, though, but don't- your complaint lists different service codes for the records keepers on the 5500s. And with those different service codes, are they valid comparators? One of the comparators that we cited had a different code. That was, I think, the Centerpoint one. The district court first said, the ones that check the same boxes, well, how do we know the boxes are an accurate depiction of what the service codes are? And then the district court said, and by the way, there's also one comparator that checked a different box. We also cited the NEPC study, which is an industry-based study, not a plaintiff study, of 121 plans. And Sweda was- the WESCO plan, in terms of size, was right in the middle, the sweet spot of that study. Had all the typical record keepers that you'd expect, and that also showed that the price was between $40 and $60 for the market price. So we did add the detail of having a lot of comparator plans, which was not in Sweda and not in Northwestern. We had detail regarding the codes in the 5500s, also not in those other cases. We had our allegations, you know, because we know that from our plaintiff. We know that from the fact that we have experts who have told us that when you have more than 5000 participants, record keeping is a commodity, and little tweaks, changes in what the services are, don't drive the price. It's only the number of participants that drive the price. And more fundamentally, when the trustees switched from Wells Fargo to Fidelity, of course they told the participants, you made a switch. I'm sure they never said good news is we're getting a much cheaper price. The bad news is you're getting the bargain basement record keeping. And if there was any difference in the actual services that made any material difference to anyone, then the trustees for their duty of candor would have had an obligation to disclose that when they went and presented the Fidelity as a new record keeper in the lower price. So again, I'm not asking for judgment on the pleadings here. I believe that we're going to win this case on the merits. All I'm asking for is that given the pleading standards that, and since every circuit court that has addressed the issue where there's comparator plans like we have here, every circuit court has gone our way. And we think the Supreme Court, both in Thibault and in Northwestern, went our way. And even in Thibault, at trial, after the Supreme Court reversed the dismissal, the plaintiffs won the share class, came at trial. All we're saying is that we deserve a chance to go past the pleading stage in this case and in discovery, they can show that there's some reason why it's three times the price, or if they can show we didn't competitive bid because we somehow knew what the real market was, or if they can show that there's some crazy math that we can't figure out in the world and doesn't ever exist, that getting the retail share, higher price shares of a stock fund, we can get the institutional share, which is the exact same product, exact same managers for a cheaper price. Maybe they can show that in discovery. I don't think so. But that's a back-end issue here. We just got to get past it. So when we sent you a focus letter last week pointing out that when ERISA was enacted, it was pulling from the common law of trust and fiduciary duties, which essentially has a kind of a business judgment rule. How do you think your theory squares up with that? And the sentence that we've been talking about from Hughes is sort of consistent with a business judgment rule. How do you think my theory squares up with that? Right. And Hughes said that and also said, but you still always have to act prudently. And so it's kind of what I said before, which is that if the trustees do their fiduciary duties to inform themselves, educate themselves, identify the right issues, get the proper information, and then do the math to the extent there is math compared to record keeping from one provider to another, if they do that and then they make a normative choice, maybe they want to have a fancier record keeper versus a less fancy record keeper, they have discretion to make informed choices. As long as they're reasonable, there's bounds to it. Let's say they make a mistake. Let's say they're negligent. How does that work? If a trustee does not do a prudent due diligence, and Northwestern also said in virtue of the next sentence that the trustee's duty is the highest duty known in the law, if the trustees completely botch it, then if they get lucky and luck into the right choice, then you might have a no damage liability. But if the trustees completely botch it because they had an improper, deceptive process, then they're liable. If the trustees have a good process and maybe some advisor that they have just gave them terrible information, but it was a good choice of advisor, just as a hypothetical, if they went to Wells Fargo and Wells Fargo lied to them and they checked it with some other provider and they lied to them about the market wise and the trustees were fully informed that it was a good process, people make mistakes. I think in that circumstance, a trustee might be able to escape liability even though the ultimate result was not reasonable and even though the trustee was negligent. But as a starting point for all trusts, since you're dealing with other people's money, you have the obligation yourself to take charge and do the appropriate investigation. How often? Every year? I don't think that for a record keeping contract every year, you would have to do it. 10 years I know is not rational at all. So for the pleadings, whether it's two years, whether it's three years, it's certainly not 10 years. I don't even think it's six years. And frankly, I don't think five years is enough to at least check the market to see what's going on. This is not like, I know Jalen Hurst has signed a good contract and he gets lots of years. So your premise is they didn't check the market? Didn't check the market. Well, they must not have checked it because they did no bidding for 10 years. And if they would have checked the market, they would have... Is bidding the only way to check the market? It's not the only way to check the market. But if you're paying three times the price, then you clearly didn't check the market. Because I'm not saying that the trustees knew that they were overpaying, but they decided to overpay because they wanted to line Wells Fargo. Maybe they had a contract. They did. Just like the Eagles have a contract at $255 million. Most of those NFL contracts are unguaranteed. They did not have a contract that tied them down to Wells Fargo for 10 years. And they could have switched earlier and if they had a contract... Did you do a letter of complaint? Excuse me? Did you allege that in the complaint? We did not allege the detail of a lockup for the Wells Fargo contract. We didn't have the Wells Fargo contract either. That's not a piece of information we can get pre-complaint. And that allegation also wasn't present in any of the other circuit decisions that have sustained these lack claims. But the reason I asked the question about the timing is that I still think it's difficult under Hughes because it's unclear where the reasonable judgments come from. Does the reasonable judgment have to be pleaded? The unreasonable judgment have to be pleaded? Is it something that the other side can respond in a motion to dismiss and say, no, here's some reasonable judgments? Is the court able to look at the record and say, well, I see something that makes sense here as to why they were paying more for record keeping than other firms were offering? Who decides? Under Hughes? Under Hughes, at the trial stage, the trial... No, at the pleading. That's the easy part. Who decides at the trial stage? At the pleading stage, Hughes reaffirmed the pleading standard that it's a plausibility standard. The plaintiff gets all the reasonable inferences and also reaffirmed that plaintiffs don't lose if it's a push or anything like that. But if it's not, if it really is that simple, then your pleading burden should be nothing more than they paid three times what other firms, other similar firms were offering. Full stop. Your theory, that's enough. Well, that is pretty much what happened if you look at the Sweden Northwester complaints. We added so much more detail than those complaints and the complaints in Kong and the Washington University case. So we actually have the meat and potatoes detail with the comparator plans, with this NEPC industry study that looked at 121 plans. We matched up codes. We explained that the standard is we make a plausible allegation. They respond with some plausible story. And because the two stories are in equipoint, so you always win. How does that take into account the reasonable judgment that the Supreme Court says we're supposed to consider their right to make? Well, if on the record in the pleadings, someone pays three times as much, I don't think that's a hard question to answer because that's not reasonable. If we came in like some of these other complaints we've seen where we said they paid $50, but we think $42 is the right number. Well, that may be something where maybe a district court judge has to start considering whether there's some choice that was actually made. But on this record that we have presented, I just don't believe any of the trustees at WESCO would have paid three times as much if they knew that they're paying three times as much. And for how many years was the one-third price offered? I don't recall your complaint saying anything about that. They could have gotten a cheaper price throughout the time within the statute of limitations. Ten years worth or just back to 2015? It goes back even further because the history, and it's been pointed out, there's been a lot of litigation in this space. But the history is that, frankly, plan trustees were asleep at the switch. The vendors, the record keepers were living high on the hog. And it was TIBL and the series of litigation that occurred where the prices just crashed and went down because all of a sudden there was now focus on, wait, why are we overpaying for this? And so this case is kind of at the later stages of this litigation wave because most plans, the good plans where they were kind of awake, when they saw TIBL and the earlier university cases, they all said, uh-oh, we better get on our bicycle and figure out what's going on. The WESCO trustees should have been doing that at least by 2015, probably even earlier. And they were one of the latest authors going to bid it out and find that there's a cheaper price. So definitely- When did the bidding happen? The bidding happened, I believe, in late 19 and the new contract started in 20. So your argument is TIBL's decided in 2015 and they needed to jump into action in 2016 and 2019 is too slow. Well, the Supreme Court reversed the dismissal of TIBL. So it's obviously good enough back then, even in 2015 and before. And again, if this court sustains this dismissal, this court would literally be overruling SAWITA, overruling Judge Brennan's written opinion for the Seventh Circuit in the Northwestern remand. It would literally create a brand new conflict with the Sasserdoe case from the Second Circuit and the Kong and the Davis versus Salesforce case in the Ninth Circuit and the Davis versus Washington University case in the Eighth Circuit. So this case, all the circuit cases that address our claims where there were comparative plans and that kind of detail, every single one of them sustained the share class claims and the record keeping claims. And so- Would you say that SAWITA and Renfro are in tension or are those two cases simpatico? Well, there was a dissent in SAWITA by Judge Roth who thought she had a different view. She was in dissent. She thought Renfro somehow controlled, but the majority said no and explained the reasons why. So I don't think they're in tension. And in fact, the Supreme Court in Northwestern did reject the notion that was underlying Renfro, which was Renfro's main point was, well, if you have lots and lots of choices of funds, it's not such a big deal if the trustees have a few funds that are really imprudent ones to pick. And the Supreme Court in Northwestern and the circuit cases reject that notion and say, look, just because you have- you can't dump in imprudent funds that are just bad funds to have on a plan simply because you throw in 50 or 100 other choices. You don't get to wash away the bad, you know, imprudent funds with the bathwater if you have a bunch of other plans. So I don't think there's any tension with SAWITA and Renfro now. And I don't think there's- to the extent there's any tension with Renfro and the Northwestern decision by the Supreme Court, the Supreme Court has basically sided with the SAWITA decision, which was correctly decided. I think Judge Brennan's Seventh Circuit decision after remand was very faithful to the Northwestern decision. And if you look at the Northwestern original complaint and compare that to our complaint, our complaint is 10 times better with more detail, more reasons, more underlying facts supporting why the trustees acted imprudently. Before we hear from Mr. Sharma, could you just address the revenue sharing issue? I don't think you've mentioned that at all yet. Why isn't that a distinction? Sure. So first of all, the revenue sharing issue was addressed in SAWITA. In fact, Stephen mentioned the revenue sharing, I believe, 30 times or maybe 40 times. And to be clear about revenue sharing, revenue sharing isn't you pay a higher cost for the retail share, and then the mutual fund gives- shares revenue with the plan participants. They share that revenue with Wells Fargo, and Wells Fargo gets the benefit of that. And in the Foreman case in the Fifth Circuit, the court addressed that directly and said revenue sharing theory is one plausible inference, but it's not the only one. And it said that you can't make those judgment calls at the pleading stage. Pasadena actually reversed the dismissal at the pleading stage of the share class claims, even though they didn't get up to the Second Circuit after the trustees had won the trial on the record-keeping claims. So the revenue- the revenue sharing arguments did not impact share class claims at all in Sasserdote. But Sasserdote said, I'm quoting- well, this part I'm quoting, but I think it was unclear in Sasserdote that, quote, revenue sharing could have been achieved with fewer retail shares. Isn't that different than this case? You can't, at the pleading stage, do any math that would show that retail shares will end up being better for plan participants than institutional shares. And we did allege in our complaint that the incentive Wells Fargo had to go to the revenue sharing model and to go to the retail versions of the share classes was to line Wells Fargo's pocket. And just, you know, again, the standard for trustees is the prudence that an ordinary person would do with his or her own money. I don't know too many people who would say, I want to pay $120 for this can of, you know, this jar of tomatoes, instead of paying $100, because I might at some point have a Walmart give some money to one of my vendors, and maybe my vendor won't skim too much off the top and maybe trickle some of that back to me. That doesn't make a whole lot of sense. And the reality is that once these litigations were filed, beginning with Tybil, all the large plans are going to the institutional share classes because they've all been woken up and realized this is the only way to go. The MAC, the MAC for doing retail shares and trying to have revenue sharing, that MAC does not work for plan participants in the real world. It only works for the vendors who end up getting the benefits of that revenue sharing. And maybe in some But if you want to actually see what that MAC is, that can't be done at the pleading stage. That's something that has to wait after the pleading stage. And I'm sure when we have expert reports, we will for sure have that debate and that's the proper stage where it belongs. All right. We'll hear you on rebuttal. Thank you. Thank you for the extra time. Thank you. Mr. Sharma? Thank you, your honors. Good morning. May it please the court. Matthew Sharma on behalf of Applebee's. Plaintiffs here attempted to plead a case of fiduciary imprudence under ERISA based on a theory that the Westco fiduciaries were asleep at the switch when it came to certain this morning. But the allegations plaintiffs put forward after three attempts did not plausibly support that theory. Plaintiffs pointed to two sets of circumstantial allegations, results related allegations that they say supported their claim. First, that the plan supposedly paid more than some group of other plans for record keeping fees in one year. One year, by the way, Judge Hardiman. And second, they criticized the inclusion of certain retail share investments in the plan, despite their acknowledgement that the purpose of those retail shares was to pay for record keeping fees. And that's a distinguishing factor from all the other cases we've talked about this morning, as I'll explain in a bit. Before you go on, can you go back to the record keeping and comment on that one year? So the allegations of the amended complaint, they built a chart, two charts, I think, to be faithful to the complaint that focused on the 16 other plans in the year 2018. That's the only year they looked at. And we don't think that's the only flaw with their syllogism here. So you're saying they pleaded that your client was paying three times above market only in one year? Correct. That's all that the second amended complaint shows. And again, that's not the only flaw, but it certainly is a flaw when we talk about the context-specific analysis that's required at the pleading stage, and that Hughes told us, the Supreme Court told us in Hughes is required. But ultimately, neither of their sets of allegations, alone or in combination, that the record keeping fees or the retail shares is sufficient to plausibly demonstrate a fiduciary breach, because they don't show that Wesco acted outside a range of reasonable judgments, which is what the Supreme Court at Hughes told us must be given due regard at the pleading stage. Hughes was a pleading case, the 12B6 case. And remarkably, plaintiff's briefs in this court don't use the phrase range of reasonable judgments once. They don't contend with that requirement, but it is a requirement the court's told us. What would it look like to have acted outside the range of reasonable judgments? What might that look like? Well, I think, you know, when it comes to record keeping fees, this complaint didn't do it. But you can envision a world where if they identified that the Wesco plan paid more than every other plan that used Wells Fargo as a record keeper, and that that was true across a multiple year period, and you didn't have the sorts of process-related allegations that are baked into the amended complaint here, the shift in record keepers, the reductions in record keeping fees that the amended complaint acknowledges, maybe that gets you closer. But again, that's not the here, and certainly not against this small universe of other plans they pointed to. We keep hearing three times as much, but compared to what? You know, that matters. You know, plaintiffs have identified this one group of plans, but there are problems with the sample set, as we pointed out in our brief. And look, at the end of the day, this is a complaint that they could literally take and use to sue many, many other retirement plans. That doesn't mean they don't have a plausible case. Well, but I do think it bears on the question of whether these fiduciaries acted outside the range of reasonable judgments. Well, I don't know about that. What I heard Mr. Schwartz say was that there was a not insignificant group of planned fiduciaries, including your client, that just weren't acting as good fiduciaries. They can say that, but they have to plausibly allege it in the second amended complaint. And all we have here is this small group of plans, Judge Hardiman. And, you know, look, even if you eliminate some of the plans that you find fault with, you still end up with four or five plans that are on the sales over that period of time. Well, but that's sort of a pleading standard, Judge Fischer. Any participant could go into the market and find four plans that paid less for recordkeeping. I mean, if that's the standard, any- Three times less? Well, you know, I don't know. The complaint here doesn't tell us that, but all they have is a group of plans here that paid less, and it's a singular focus on the fees. But we're at the pleading stage, and the question is, if they allege the plausible obligation as to fiduciary duty to get more reasonable prices for recordkeeping. You're right. We're at the pleading stage. And what the Supreme Court just told us in Hughes is at the pleading stage, we apply Iqbal, we apply Twombly, and courts have to give due regard for the range of reasonable judgments. And I'd submit that just pointing to- The Supreme Court doesn't say that. The Supreme Court says the courts should give due regard to reasonable judgments. It doesn't say that you need to do that at the pleading stage. You can read it that way. The question I would have, how can a plaintiff almost plead in the negative that there were no other reasonable judgments out there that could have been sufficient for these claims? That seems like an impossible burden at the pleading stage for any problem. Well, I think, first of all, Judge Fischer, Hughes was a pleadings case. It's a 12B6 case. Our reading of Hughes is that that's a test for the pleading. And by the way, that's what the Seventh Circuit- The reading of it was that, and I'm not sure that you even offered it as an item in the brief until it was, you were asked to focus on. I, we certainly talk about the need to plead something outside the range of reasonable judgments in our briefing based on Hughes, but I'll submit the- Well, I don't know. I'm surprised you're fighting on that battleground because I think it's axiomatic that paying three times market is outside the range of reasonableness. I understood your brief to make a different argument, which is that it's not an apples to apples comparison because it's not, to use Mr. Schwartz's example, it's not the same canned tomato sauce at two different vendors. This is a service. Sure. And you might be getting a very different quality of service at one restaurant than you're at a different restaurant, right? So if they're comparing a fine dining with fast food, you expect the fine dining to be three times as expensive, right? But Mr. Schwartz's argument, as I heard him, was that's not, this is more of a commodity. This is not a bespoke service. Why is he wrong on that? Yes. I'm sorry. I didn't mean to interrupt you, Judge Harmon. I think that's absolutely right. That's a core premise of our case as well, and it's something that the district court hooked into appropriately in its decision below. But again, I think that bears on the question of whether they've pleaded something outside the range of reasonable judgments, because they're focused only on fees. They're not accounting for the fact that this is not a commodity, correct? You think service is not a commodity. Do you even get to tell that story? Or if the allegations that they've made are plausible on their face, then aside from whatever story you might have, that gets them across the 12B6 line. Judge Porter, I think that gets to your question about who has to plead what, right? Is it sort of this shifting process back and forth with the motion to dismiss stage or not? It's not, right? This is a pleading standard, and what the plaintiffs have to prove, and sorry, not prove, plead, is conduct outside the range of reasonable judgments. So they have to plead that. It's not about what we come back with or don't come back with at the pleading stage. And again, this is a test that the Seventh Circuit on remand and Hughes applied. They asked whether plaintiffs had pleaded outside the range. And their argument is that, you know, look what happened on remand. And their argument is that their complaint is more fulsome than the complaint in that case and in Sweden. Why are they wrong? Well, I think there's two issues there, right? What's the test that the Seventh Circuit applied on remand, and how did it work out based on the context-specific facts of that case? So the test is the test we're advocating for here. Did they allege facts outside the range of reasonable judgments? Hughes was a different case, particularly when it came to record-keeping, as was Sweden, as we pointed out in our 28J response, right? I mean, Hughes was very focused on this idea that the fiduciaries allegedly did not consolidate to a single record keeper to gain the benefit of bargaining power. We did that. We had one record keeper. Well, that's right. We always had one record keeper. And that's a critical distinction. And Hughes makes that point multiple times over, even dropping a footnote to distinguish its decision in Albert, which by the way, Albert versus Oshkosh, we think has to be read in harmony with Hughes because Hughes on remand affirmed the Seventh Circuit's earlier decision in Albert versus Oshkosh. And if you go back and look at the amended complaint in Oshkosh, it looks a lot like the they had found nine or 10 other plans that they said paid less in a single year. They didn't plausibly account for the services that were being provided in exchange for those fees. And the Seventh Circuit affirmed dismissal of that case. Is it for this court to decide the reason on this question regarding the difference in cost? For example, you're quite right that a plaintiff could always find cheaper cost alternatives. But getting back to Judge earlier, if we're talking about a difference between $39 per participant and $42 per participant, I assume your position is that this court could say that that $3 extra is not an unreasonable premium for this fund to pay, for the fiduciary to pay. Is that true? If it's for the court, the court could, if his pleading was they paid $42, they could have got $39, we have a case. I assume your position is this court could say that's not unreasonable. I would say that on those allegations, plaintiffs have been, plaintiffs would not have shown that the record keeping fees were outside the range of reasonable Okay. But conversely, if it's three times, if it's 50 to 150, can this court say, that sounds unreasonable? Is it the job of the court to evaluate that normatively and say, three times sounds unreasonable? I think an approach that focuses on the magnitude of difference between supposedly prudent plans and a challenge plan is not the right way to go here, because it's an acontextual approach that just looks at the price tag at the end of the day. Isn't the deeper question, who makes that decision? Is it some judge deciding that $39 is inadequate compared to $42 or $52 or $62? How does the judge know? Well, and again, that's where we come into the range of reasonable judgments. Plaintiffs have to plead sufficient facts to take it outside the range of reasonable judgments. Doesn't that also come into the range of plausibility? That's where it's at. How does the judge know? Our task at this point is to determine whether or not this claim is plausible. A fact finder has to make a determination later down the line as this case goes forward, as to whether the actions, once we hear, once that fact finder everything your clients did in managing the cost. So again, I think it comes down to what the plaintiffs have to allege here at the end of the day in terms of a range of reasonable judgments. All right. Let's assume for the sake of argument that it's enough to allege that you paid three times market. Let's just assume that that's enough for them to carry their burden. What if your motion to dismiss included information that explained why you paid three times as much? Is that something we could take cognizance of and say, oh, three times sounds really expensive, but boy, they got a much better meal than what those bargain basement folks were offering? Or what if your motion says, yes, that one year, 2018, it was three times more. And then we changed. Either way, what happens next? Well, I think, look, rule 12B6 is a pleading standard, okay? It's not supposed to require defendants to have to come forward with affirmative evidence that refutes things, but what I understand is what plaintiffs have to allege, Judge Hardiman, is conduct outside a range of reasonable judgments. And again, we think- Are you saying that that response really puzzles me? Because if what you're saying is the burden is not on us to respond at the rule 12 stage, then you're never going to get your motion granted. Because the premise of my hypothetical is that they have pleaded something unreasonable by pleading something that appears to be excessively expensive. Well, under that hypothetical, then, Judge Hardiman, I think what you have to do against that is look at the context-specific facts as a whole. And I'm not talking- Where do we learn about the context? Isn't that through your motion to dismiss? In part, in this case, it was, based on some of the judicially noticeable documents that were included, right? And so I think that those things are certainly fair game on a motion to dismiss, and that was true here. But again, you have to look at the whole big picture. You can't just look at fees in isolation. And we haven't talked much about the process steps that are acknowledged in this case, but there's no dispute. Plaintiffs acknowledge that the plan here switched record keepers in 2020 as a result of a competitive bid, by the way, right? Which is no small undertaking. Right. I mean, in a strange way, it's almost as if their complaint is based on the notion that you did the exact right thing in 2020, you just did it too slowly. You should have done it back in 2017. Exactly right. And that fact, in particular, becomes a bit of a sword and a shield for the plaintiffs and the complainants. A heads, we win, tails, you lose situation because they say fiduciaries- So is the jury supposed to determine what's a reasonable amount of delay for you to get with the program and put it out for bids and get a more reasonable cost? Is that what this trial would look like if this case went forward? It shouldn't be because fiduciaries are empowered to make certain judgments based on their expertise, right? But are they allowed to be slow? Are they allowed to be? That's why I asked the question of timing. Mr. Schwartz said, not necessarily every year you have to put out for bids, but you have to sort of know the market. Well, how often does a reasonable fiduciary have to know the market? Well, and to your question earlier, Judge Hardiman, a competitive bid and RFP process is not the only way to test the market, right? What are the other ways? Well, a fiduciary could do benchmarking without a full request for production. A fiduciary could use that information then to negotiate fee reductions with its record keeper without putting it out to multiple providers to bid on it and potentially shift record keepers. And those facts, by the way, are also baked into the complaint here, at least in as much as the fiduciaries negotiated fee reductions with Wells Fargo. The asset base fee went from 14 basis points to 11 to nine to six and a half. So that's all in the lead up from 2015 to 2019. Then they make the switch to a new record. That's your answer for reasonableness. The progression to ever better fees for your participants. That's exactly right. And in addition, there were rebates that were negotiated as well, which is something we talk about. Go back to Judge Hardiman's hypothetical for a minute. The plaintiffs aren't going to tell the court about the reasonable range of alternatives. That's not their burden to do that. How's the court going to know, except through the motion to dismiss, what the reasonable range of alternatives are? It has to come in through the motion to dismiss, right? You can't stop at the complaint. Well, the way that the Seventh Circuit dealt with this issue on remand is to say they have to plead claims outside the range of reasonable judgments. On those specific facts, the Seventh Circuit on remand said, these claims get them. How would the court have the context to know what's outside the range of reasonable judgments, unless he's heard from the defendant? Unless the court's then heard from the defendant. Here's why it was more expensive. Here's why it was only for a year, and then we caught it or whatever. Well, part of that comes in in some of the judicially noticeable documents that we submitted, but again, it's not the defendant's pleading burden in these cases to provide a reasonable, plaintiffs have to plead something outside the range of reasonable. I'm not sure why you keep reverting to the Seventh Circuit's decision, because as I read it, they said, if there's a plausible inference of negligence or fiduciary breach, and there's an equally plausible story on the other side, and the two stories are in equal place, we'll get that tied to the plaintiff. Isn't that sort of what they did? In a sense, yes, and I think that particular gloss of it was not faithful to Rule 12 in Iqbal and Tuamli, because Iqbal itself talks about that where the complaint pleads facts that are, quote, merely consistent with liability, it stops short of the line between possibility. So I think that piece of it was a bit of a misstatement on the Seventh Circuit's part, but again, these are issues that can be resolved at the pleading stage, because it's a plaintiff's burden to plead something outside the range of reasonable The plaintiff's share class claim in this case is very specific. They did not allege in the Second Amended Complaint that the use of retail share classes as a general matter was improved, because they acknowledged in the complaint that WESCO used those retail share classes to pay revenue keeping fees to Wells Fargo. At paragraph 133, defendants selected mutual fund share classes that paid revenue sharing to Wells Fargo, and they went a step further in footnote 31 by alleging that the difference in the cost of the share class, the incremental fee difference, was for the purpose of revenue sharing to Wells Fargo. So against that backdrop, plaintiff's claim here is a specific one. It wasn't the use of retail share classes generally that was a problem. It's really just another gloss on their record keeping fee claims, because they say retail share classes weren't necessary to pay record keeping fees because Wells Fargo's fees were already too much. So it's really just another gloss on the record keeping fee claim, and we went back and looked at the complaints from all the other courts that have addressed this issue, which Mr. Schwartz cited this morning in Sueda, in Hughes, in Sasserdale, in the Second Circuit. None of those other complaints had this component pled on its face. The courts in those cases said, well, revenue sharing might be one explanation, but it's not the only explanation, right? And this case, this complaint expressly pleads that. It sets this case apart, and in our view, it really just makes this sort of a subcomponent of plaintiff's record keeping fee claim. We've touched on this a couple of times, but let me ask you directly, what's your best argument that this case is distinguishable from Sueda? I think Sueda is a different case in a few respects. The share class piece of it is exactly what I just said. There was no allegation in Sueda that the share classes were used for revenue sharing. That is the case here. On the record keeping fee claims, again, I think Sueda, like Hughes, was in part focused on the use of multiple record keepers, the failure to consolidate. There also were no process facts that were acknowledged in Sueda, like the shift to a new record keeper as a result of competitive bidding, like the fee reductions that took place in the years leading up to that. So I think on those facts alone, Sueda is distinguishable. And I also think Sueda was a bigger case. There were more allegations of fiduciary imprudence, including the notion that there were duplicative investments, there were layers of fees that were formed over a sustained period of time. And the court in Sueda, Judge Fischer, looking at all those allegations as a whole, taken together, thought that they did enough to nudge things over the line to plausibility. So these allegations are quite different than Sueda, and we think that's why the district court here was right to dismiss the complaint, and we'd ask this court. So the essence of your argument is they took a snapshot in time where the record keeping looked like there was a problem here. Is that the sum of your... Yeah, that's part of it. But then they also just focused exclusively on the price tag at the end of the day. And you have to look at... Well, but I... Yeah, fair enough. But I think that's true. But I haven't seen anything from your side of the equation to show that this wasn't McDonald's versus Burger King versus McDonald's against the French Laundry. Let me give you one example on that point, Judge Hardiman. One of the services that plaintiffs elect, record keepers can provide but don't always provide, this is a paragraph with one of the Second Amendment complaints, is the maintenance of an employer stock fund, right? Some employers choose to offer their own stock as an investment option in a 401k plan. And that entails more work than a plan that doesn't. You have to do regular valuations. It can vary depending on whether the stock is publicly traded or privately held. The WESCO plan included an employer stock fund. One of the plaintiffs here invested in it. And one would expect that if you have a plan that has an employer stock fund, the plan might negotiate for those services and perhaps pay more for those services than a plan that does not. Plaintiffs don't say anything in the Second Amendment complaint about whether any of the other plans offered an employer stock fund, just to take one example from the Second Amendment complaint. But again... All right. So that gets to... That's apples to oranges, you're saying. Correct. What other evidence do you have that it's apples to oranges in addition to what you just said? Well, that's one clear example. We talk in our complaint about other differences that fiduciaries can reasonably value in selecting a service provider, the breadth of the customer service operations, right? Are your call representatives based in the U.S. or are they offshore? Some fiduciaries care about that issue. What does your participant education look like? Are you going to have... Does continuity of service matter? Sure. Yep, absolutely. That's a component of it. Recordkeeper reputation, how capable is a recordkeeper of handling an influx of new participants if a company's going through a phase of acquisitions and expecting to grow and merge plans? All those things can be something that the fiduciaries consider as part of selecting a recordkeeper. And so, yes, they've seized on one year of the plan where they say we paid more, but not only have they done that, they've ignored the broader contextual analysis required when they look at services, and they've also ignored the process fact that this complaint itself acknowledges in terms of the prudent steps WESCO took along the way, which certainly belied the notion that they were asleep at the switch. Thank you, Mr. Sharma. If I could just say one quick thing about the issue you first raised, Judge Hardiman, regarding the tweeting... Yeah, we didn't let you get that. Just to address it, you're exactly right. We read that as a gotcha moment. It was a passing reference from a parenthetical... District Court strangely repeated it three times. That's what puzzled me. Well, I think if you look at what the district court did, it was applying the right standards that they've all been used. But at the end of the day, this court's reviews plenary under Rule 12b-6, and so it's really more of an academic discussion than anything else. But again, we think given a contextual holistic reading of the district court's analysis, it applied the proper standard here. Thank you. Thank you. Your rebuttal for Mr. Schwartz? Thank you, Judge Hardiman. On the issue of this one-year issue, if you take a look, if I could direct your attention to paragraph 99 of the Second Amendment complaint, that appears at Appendix 2141. The overall participant fees in 2015 were $161. In 2016, it went down to $157, 2017, $185, 2018, $154, $29, $153. We did not just look at a snapshot, number one. Number two, we didn't cherry-pick the 16 comparator funds. But to the extent that's their argument, we also cited the NEP study. That is an industry study, not a plaintiff-driven study. That looked at 121 different plans. The NEP study did not say, let's try to find the cheapest, lowest-rent record-keeping bundle of services. And it reached the same conclusion as we did, that the price per participant should be between $40 and $60. So our comparator plans, the fact that it wasn't cherry-picked is buttressed by the NEPC broad-based study, which is an industry study. And in fact, the question was raised, how besides competitive bidding could trustees figure out what the average prices should be? They could have read the NEP study. They do that every year. And it was out there in the market. And by the way, if we're talking about timing, the Suida case was filed in 2016. That complaint said that the record-keeping price per participant should be $35. So the notion that this information about what the prices were didn't become apparent until 2018 or 2019, just not true. And Suida was not one of the first of these record-keeping cases that was filed. What about the progression about the reduction in prices? Right. So first of all, there is no evidence in this record whatsoever that those price reductions had anything to do with what the trustees did. And there's no evidence that those variations in price were not just based on market fluctuations, because there are two ways that you can price record-keeping. The proper way to price it is to have a per participant price. Now, some trustees, in their discretion, I think they can do this, say, I'm a little concerned if we do like $50 a participant, and maybe that hits the guy with $10,000 in their plan versus $800,000. So what happens in the market is sometimes the pricing is negotiated on a per participant price, but then it's reverse engineered to do like a percentage of assets or whatnot with a cap. And in the Suida case, in the Suida argument, the issue of a cap on a per participant price was discussed. And so these fluctuations that they mentioned are just fluctuations about what's going on in the market and whatnot. But as I pointed out for the overall per participant price, it was always in the 150 to 160 range. It was always high. And also, as we pointed out in our brief, there were some years where the direct fees went up, and there were some years when the indirect fees went up. So that's just noise in the progression of the fees. But there's no evidence in this record, and I don't think there'll be any evidence when we get into the discovery phase that it had anything to do with the trustees. And the second point is that... Are you arguing that there has to be causation between what the trustees do and what the price is? Isn't it just an objective question as to the reasonableness of the price? What I'm arguing is that the prices fluctuate from 161 to 157 to 185 to 154 to 153. That kind of fluctuation, when they're all three times as much, that's just noise. It's still three times as much. And what I'm saying is there's no inference in this record that where we said the trustees did no competitive bidding, did nothing else to evaluate the pricing, that any of those fluctuations had anything to do with what the trustees were doing. I believe the point that Mr. Charbol was trying to make about that is that that shows that the trustees were actually very focused and negotiating price reductions. If they negotiated a price reduction one year, but then it went up the next year, then it doesn't make sense. And certainly not at the pleading stage, that doesn't make sense. With regard to the question, what's the difference between this case and Suida? For the two record keeper issue, Judge Brennan addressed that in Northwestern, and he said that that claim was weak, and adding it didn't change the result. And the reason why the two record keeping issue is just irrelevant here, in the university cases, the reason why there was two record keepers was historically the universities had TIA, the Teachers Investment Annuity Association plans, and they added in the Fidelity plans, or the Vanguard mutual funds. And they had two record keepers because the Fidelities and the record keep and do work and didn't want to do work on the annuities that TIA had, which were in those plans. But Northwestern, the court said at the end, that the issue isn't that he had two record keepers or one, the issue is the price. And the issue is that, as Judge Brennan said, the trustees should have negotiated with both TIA and Fidelity to reduce the record keeping fees. And so that was not a reason that was why in Northwestern case after remand, that the dismissal of the complaint was reversed. Next, for the share class claim. Are the providers, I mean, they're not obligated just because you said you should have negotiated, let's say you try to negotiate, they could say no. Negotiation isn't a talisman here. Right. A provider can say yes, a provider can say no. And if everyone negotiates and tries to get the best deal, then there's no best deal, really, if everyone's getting the same deal. If everyone gets a deal within a range of $35 to $50, that's the range, that's the market price. So if you're at $47 instead of $42, that kind of gets to the issue that was asked, well, in a complaint, is that enough? But if the range is $35 to $50, and you're at $150, that's not because you're either the worst negotiator in the world or more likely you just didn't ask the right question because you didn't know. It sounds like from your perspective, there really isn't a need to consider the reasonable range of alternatives. It's just, as you've said a number of times, it's just math. So you can pick what you think is a reasonable price or look at the average price across the time. They bridge their fiduciary duty. I guess lawyers could put anything they want in a complaint. But if you're three times as much, there's got to be some amazing explanation that defies logic. And maybe when we get into discovery, there'll be some defying logic explanation for this. But on this pleading record, you just can't do that on this pleading record. And the reality is that even our comparators, we had five plans that had Wells Fargo as a record keeper at the same time, and they were in exactly the same range it should be in. They did not even get the best Wells Fargo price. And when we get to discovery, the trustees better have a real good explanation as to why that is. Maybe for three times as much, maybe you're right. I don't know. But let's talk about the next case after this one. What if it's two times? What if it's a time and a half? How do we evaluate that? Well, I didn't bring a weak case, so it's not an argument. It's not a hill I really want to climb. In Sweden, I believe the range was much narrower and the complaints, the dismissals were still reversed. But look, I appreciate that you could have cases where someone's saying, well, it's $58, not $53. And that's a tougher case for court to decide. What the district court did here was just ignored the three times multiple. And I don't think you're being fair to the district court. It said that you didn't provide the district court with enough support or perhaps any support to show that it was a cost comparison. The cost alone is not a sufficient policy. Isn't that what the district court did? Well, the district court said that. But so let's go through. I guess we're going to have to go through exactly what happens if you put in front of the district court, because candidly, the district court ignored that. What we said in our complaint was that, number one, like in Sweden, that if you're over 500 planned participants, it's a commodity for recordkeeping and the price doesn't change in any material way based on particularized services. That's at paragraphs 55 to 56 of the We then alleged that Fidelity provided the same services as Wells Fargo did, and that the defendants in their communications with plan participants never told their participants otherwise. We also alleged exactly what Wells Fargo provided in terms of services, and we said Fidelity provided the same. That's paragraph 114. That's the appendix 2147 to 2148. We then said that the only driver of price is the number of participants. It's a per-participant analysis, and I'm not sure what else there is to say. The notion... Well, that certainly gets back to the issue. This is a commodity. Something is broke about it, and that's that. So cost, again, if it's a commodity, then cost really is the issue. In a commodity situation, cost is the primary issue. And again, we're all talking about speculation land here. There's speculation about, do you have the eight operators sitting in Pennsylvania, or do you have one operator in a basement in Indonesia or something, which no one knows what it is. But again, they put in the record portions of the two contracts for Wells Fargo and Fidelity. They strategically kept out the portions that would specify, this is what you got to provide for services for both contracts. They did that for a reason, and it's not because they're stupid, because they're really good lawyers. They did that for a reason. And what's the district court to do? The district court should either say, I'm not going to consider incomplete documents if you're trying to cherry pick what you put in, or the district court could have said, put in the whole documents if you want to really push this argument, and we'll fight it out. We would have been perfectly happy for them. And you weren't able to show that they cherry picked because you didn't have the full documents. We did not have the full documents. This is where we get back to where we started, which is there seems to be a real tension between traditional Rule 12 practice, even with the Twombly-Iqbal gloss on the one hand, and what Hughes says on the other, because Hughes does seem to require more searching inquiry than what we were traditionally accustomed to. So the cases for the ERISA cases do point out that the plaintiffs at the complaint stage don't have the access to information like you would in a car accident, for example. But if I had put nothing in the complaint about the fact that it's a commodity, that Wells Fargo and Fidelity are providing the same services, if we had nothing, if we didn't have the checkboxes where we compared them and showed they were, you know, I think 15 out of the 16 were all the same, if we had nothing, well, then maybe there'd be something to discuss. But we put that stuff in our complaint, and the same arguments were made in all the circuit cases, and every single circuit case where there are comparator plans goes our way. And as far as Sweden, one thing about Sweden is in Sweden, on the record, Penn, the University of Pennsylvania, had not actually gone out and finally gotten the bid, so we did not know what the market would actually show. So you did not have the three times number in Sweden, but the decision was still there's enough in that complaint. The fact that they eventually got the number, which was $53, that helps me on the complaint, because it shows what the true market price is, so I can do a direct comparison. In Sweden, there had to be a little bit of a guess of how much could they reduce the record keeping per participant prices. Here, we don't need to guess, $53 is a number, and it just seems to me if you're bidding it out between Fidelity and Voya and Transamerica and Vanguard, you're not getting some barred-in-basement low service price. You're just not getting a low bundle of services, and maybe that's the only one thing that the trustees here, at least on this record, did right, which is they bidded out to the right companies, and they got a great price, even though that price is still higher than the averages in the NAP study, still higher than our comparators. So it's theoretically possible that they did a bad negotiation. Maybe they could have gotten $47 or $42, or it's also possible, maybe the reason why, instead of getting the lower price that is in our comparators, including from Fidelity, because the Fidelity comparators were in the $35 to $45 range, maybe it's possible the reason why they paid more than that range and were up to $53 was because they got the gold-plated standard, the gold-plated plan from Fidelity. Whatever the inference is, it helps me, and it merits for sustaining the complaint. When we get into discovery and how does the judge decide how you weigh the choices, we'll have the experts, we'll have all the data, we'll have the full contracts, and if we need to, we'll depose Fidelity and Wells Fargo and see exactly what the differences are. But the district court said maybe it's a Macintosh apple versus a Fuji apple. At the pleading stage, an apple is an apple. Thank you, Mr. Floyd, thank you. I appreciate the argument, the briefing. We'll take the matter under advisement.